FILED

2011 Sep-13  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **RODNEY WADE,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:10-cv-2084-JHH** |
| **STERILITE CORPORATION,** | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OF DECISION

The court has before it the July 27, 2011 Motion (Doc. #11)for Summary Judgment of Defendant Sterilite Corporation.  Pursuant to the court's July 28, 2011 order (Doc. #15), the Motion was deemed submitted, without oral argument, on August 25, 2011.  For the following reasons, the Motion is due to be granted in full.

## I. Procedural History

Plaintiff Rodney Wade commenced this action on July 30, 2011 by filing a Complaint (Doc. #1) in this court alleging violations of 42 U.S.C. § 1981.  Plaintiff contended that Defendant's termination of his employment constitutes race discrimination. Defendant's July 27, 2011 Motion (Doc. #11) for Summary Judgment asserts that Plaintiff has failed to make a prima facie case of race discrimination

and/or, in the alternative, Plaintiff has failed to rebut Defendant's legitimate and nondiscriminatory reasons for his termination. Defendant, therefore, contends that summary judgment in its favor is proper.

Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted evidence[1] in support of its own Motion for Summary Judgment and filed a supporting brief on July 27 and 28, 2011. On August 8, 2011, Plaintiff filed a brief (Doc. #17) in opposition to Defendant's motion for summary judgment[2]. On August 25, 2011, Defendant filed a brief in reply (Doc. #18) to Plaintiff's opposition to the Motion for Summary Judgment. All briefs and evidence have been considered by the court.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023

---

[1] Defendant submitted the following evidence: deposition of Leighton J. Evans, with exhibits; deposition of Rodney Wade, with exhibits; deposition of Flora Hollis, with exhibits. Certain exhibits are filed under seal pursuant to the court's July 28, 2011 order.

[2] Plaintiff did not file separate exhibits, but instead, in the interest of economy, relies on Defendant's evidentiary submission in support of its opposition.  (See doc. #17 at n.1)

(11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp.</u>, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  <u>Id.</u> at 324.

The substantive law will identify which facts are material and which are irrelevant.  <u>Chapman</u>, 229 F.3d at 1023; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  <u>Chapman</u>, 229 F.3d at 1023; <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248; <u>Chapman</u>, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249.  The  method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing

3

United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require

4

evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

**III. Relevant Undisputed Facts**[3]

Plaintiff Rodney Wade, an African American male, was hired by Sterilite in 1998 at its Birmingham, Alabama, facility.  (Wade Dep. at 17.)  Sterilite is a manufacturer of plastic household items. (Evans Dep. at 8.) Sterilite operates six manufacturing facilities in the United States, including the facility in Birmingham, Alabama.  (Evans Dep. at 10.)  John Evans is the Plant Manager at the Birmingham

---

[3]   Facts are undisputed unless otherwise expressly noted.   If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20 F.3d at 1115.

facility and has held that position for over eleven (11) years.  (Evans Dep. at 8-9.) Flora Hollis is the Human Resources Manager at the Birmingham facility and has been in that position for approximately eight (8) years.  (Hollis Dep. at 9.)

### A. Sterilite's Substance Abuse Policy

Sterilite has a substance abuse policy which prohibits, among other things, the presence of drugs that are illegal under federal law in an employee's body while at work.  (Exh. 1 to Wade Dep.).  The Sterilite policy states that "an employee who tests positive for alcohol, illegal drugs, or misuse of medications will be subject to disciplinary action up to and including termination."  (Exh. 1 to Evans Dep.)  Under the policy, Sterilite "uses a urinalysis method for the testing for illegal or improper use of prescription or over the counter drugs."  (Exh. 1 to Wade Dep. at 3.)  All applicants for employment must take and pass a drug test.  (Evans Dep. at 13.) Employees must also take and pass a drug test if they are involved in a workplace accident or if they are selected as part of a random screening process.  (Id.)  Wade received a copy of the Sterilite drug testing policy.  (Wade Dep. at 8; Exh. 1 to Wade Dep.)

Sterilite tried to perform about ten (10) random drug tests per year.  (Id. at 15.) Approximately two to three days in advance, Sterilite schedules random drug tests to be conducted by the Norwood Clinic.  (Evans Dep. at 17 & Errata Sheet; Hollis Dep.

6

at 13-14.)  The dates are randomly selected by Evans and the HR Manager.  (Evans Dep. at 15.)  On the day the drug test is to be administered, Sterilite selects the employees to be drug tested by placing the time cards of all employees at work at the time, including administrative and exempt employees, into a container.  (Wade Dep. at 12; Evans Dep. at 14 & Errata Sheet.)  A union steward randomly draws the names of five (5) employees to be tested.  (Evans Dep. at 14 & Errata Sheet.)  The employees selected are then escorted by either Evans or another supervisor to Sterilite's administrative offices, where they are instructed by a Norwood Clinic employee to empty their pockets and provide a urine sample.  (Evans Dep. at 17, 20; Wade Dep. at 27-28.)  The Norwood Clinic employee then conducts an instant drug screen on the sample.  (Wade Dep. at 29; Evans Dep. at 21.)

If the instant screen result is "non-negative," both the employee and Evans are notified.  (Evans Dep. at 22.)  The "non-negative" sample is sealed and sent to the Norwood Clinic for confirmatory testing under the supervision of Dr. S.R. Shah, the Medical Review Officer for Sterilite.  (Hollis Dep. at 24; Evans Dep. at 21-22.)  Sterilite has no other involvement in the testing after it is sealed and sent to the Norwood Clinic, until it receives the confirmatory test results. (Evans Dep. at 24.)  Any employee with a "non-negative" result is suspended pending the receipt of the confirmatory test result. (Id. at 20-21, 22-23; Hollis Dep. at 24.)  However, if the

employee has previously tested "non-negative" for the same medication and have produced a prescription for continual medication, Evans allows the employee to continue working until the final results are received.  (Evans Dep. at 22-23.)  If an employee tests positive for illegal drugs or alcohol on the confirmatory test, his or her employment is terminated.  (Evans Dep. at 23, 25-26; Exh. 1 to Wade Dep. at 4.)  If the results come back negative, the employee resumes work and is paid for the entire time off.  (Evans Dep. at 23.)

### B.  February 19, 2009 Random Drug Testing

A random drug test was scheduled for February 19, 2009.  (Hollis Dep. at 17.) Alberta Clancy, an African American union steward, drew the names of the five employees for the random drug testing.  (Evans Dep. at 28-29.)  Wade was one of the five employees selected.  (Id. at 31-32.)

Evans went to the Machine Shop where Wade worked to inform him that he has been selected for drug testing.[4]  (Id. at 30.)  He also informed Tonya Copple, another Machine Shop employee who is white, that she has been selected for drug testing.  (Id.; Wade Dep. at 29.)  Wade informed Evans that his drug screen would

---

[4] Wade testified that he was in the breakroom getting ice so that he could take his medication when he was selected for the random drug test. (Wade Dep. at 10, 12.)

8

probably be positive because of the prescription medicine  he was taking.[5]  (Wade Dep. at 29-30, 36; Evans Dep. at 27-28.)

Both Wade and Copple  received "non-negative" results,[6] and both employees told Evans that they were taking prescription medicine.  (Wade Dep. at 27, 30-31, 47; Exhs. 3 & 6 to Wade Dep.; Evans Dep. at 32.)  Because they received "non-negative" results on the instant screen, Wade's and Copple's urine samples were sealed and sent to Norwood Clinic for confirmatory testing.  (Wade Dep. at 27, 37; Evans Dep. at 22, 32-33.)  Both Wade and Copple were suspended pending the results of the confirmatory drug test.  (Wade Dep. at 30, 42; Evans Dep. at 32.)

After receiving the "non-negative" result on the instant screen, Wade went to Walgreen's to obtain a copy of his prescription records.  (Wade Dep. at 30; Exh. 8 to Wade Dep.)  He brought the records to a Human Resources representative at Sterilite who told him that Sterilite did not need his records.  (Wade Dep. at 51-52.)  Sterilite's Human Resources does not accept prescription records for employees.  (Hollis Dep. at 29.)

---

[5] Wade was taking Hydrocodone at the time.  (Wade Dep. at 36).  He was undergoing pain management for a knee problem.  (Id. at 15.)  Wade testified that he previously had three or four arthrosporic knee surgeries and was trying to manage his pain through pain management instead of having another surgery.  (Id. at 15, 24-25.)

[6] The other three employees, who were all African American, tested received negative results.  (Evans Dep. at 31-32.)

9

Wade's confirmatory test was positive for two opiates: Hydrocodone and Hydromorphone.[7]  (Wade Dep. at 37-38; Exh. 4 to Wade Dep.)  Dr. Shah's office called Wade and asked him to provide his prescription records.  Wade did not have a prescription for Hydromorphone, and he contends that he had never taken this drug.  (Wade Dep. at 38-39.)    Wade did have a prescription for the Hydrocodone, as he was taking it for pain management associated with his knee injury.  (Wade Dep. at 14-16, 38.)

The Norwood Clinic informed Flora Hollis, the Human Resources Manager, that Wade's confirmatory test was positive and that he did not have a prescription for Hydromorphone.[8]  (Hollis Dep. at 33; Ech. 9 to Hollis Dep.)  The Clinic faxed a copy of the confirmatory results to Sterilite.  (Hollis Dep. at 32; Exh. 9 to Hollis Dep.)  After receiving these results, Hollis called Wade on Monday, February 23, 2009,and asked him to come to Sterilite for a meeting the next day.  (Wade Dep. at 42-43; Evans Dep. at 35-36.)

On Tuesday, February 24, 2009, Wade arrived at work and found the police and his toolbox waiting for him.  (Wade Dep. at 42.)  Evans told Wade that he was

---

[7] Handwritten notes by the Medical Review Officer indicate that Hydromorphone is the drug Dilaudid.  (Exh. 4 to Wade Dep.)

[8] The Norwood Clinic reported that the confirmatory test for Tonya Copple was negative. (Wade Dep. at 49-50; Exh. 7 to Wade Dep; Hollis Dep. at 36-37.)  She was permitted to come back to work.  (Wade Dep. at 48; Evans Dep. at 39; Hollis Dep. at 37.)

terminated because of his positive drug test.  (Id. at 43; Evans Dep. at 35-36.)  Wade asked Evans if he could take another drug screen, but Evans said that there was nothing else he could do.  (Wade Dep. at 43.)

The same day he was terminated, Evans went to his physician's office and took another drug test.  (Wade Dep. at 40, 47.)  The results of that test, taken five days after the random screen at Sterilite, showed that the only drug he was taking was Hydrocodone.  (Id. at 46; Exh. 5 to Wade Dep.)

## IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination under 42 U.S.C. § 1981.  Specifically, he alleges that he was terminated because of his race.  Under section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a) (1994).  Claims of race discrimination under section 1981 are analyzed in the same manner as disparate treatment claims brought under Title VII.  Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence,

11

or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  Here, Plaintiff has presented only circumstantial evidence of racial discrimination.  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."  Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated

12

dissimilarly.[9]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[10]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[11]  Where the defendant articulates multiple, reasonable,

---

[9] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[10] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[11] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that

legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at. 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in

---

reason is not sufficient.  Chapman, 229 F.3d at 1030.

evaluating a Rule 50 motion);[12] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## A. The Prima Facie Case

To establish a prima facie case of disparate treatment, Plaintiff must demonstrate the following: (1) that he is a member of a protected class; (2) that he was subjected to an adverse employment action; (3) that he was qualified to do the job; and (4) that his employer treated similarly situated employees outside Plaintiff's protected class more favorably.  McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008); Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).  Sterilite does not dispute that Plaintiff can establish the first three elements of the prima facie case.  It contends, however, that Plaintiff's prima facie case fails because Plaintiff cannot produce any evidence that a similarly situated Caucasian employee was treated more favorably than he.  (Doc. # 12 at 8-9.)

To be an adequate comparator, the preferentially treated individual from

---

[12] The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects.  Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).  In determining whether employees are similarly situated in cases involving allegedly discriminatory discipline, the court must evaluate "whether the employees [were] involved in or accused of the same or similar conduct and [were] disciplined in different ways."  Burke–Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006).

Plaintiff contends that Chris Compton and Gary Price, both Caucasian, are suitable comparators.  (Doc. #17 at 9-10, 17-19.)  Sterilite contends that neither man is a suitable comparator.  (Doc. #18 at 2-3.)  After a close review of the evidence presented in the record, the court agrees with Sterilite.

### 1. Chris Compton

Compton was a salaried Shift Supervisor who was terminated from Sterilite because he failed a drug screen.  (Evans Dep. at 53.)  There is no evidence in the record stating the date of his termination, but Evans was the Plant Manager  and Hollis was the HR Manager when he was terminated.  (Id.)   Some time after Compton's termination, he came back to Sterilite and applied for a job.  (Id. at 55.)  Evans and others discussed possibly rehiring Compton because of his exceptional

16

skills with processing, but Sterilite declined to bring him back.  (Id.)  A few months later, Compton came back and reapplied for a job with Sterilite.  (Id.)  At that time, the Birmingham facility had a couple of openings that were difficult to fill because of the high skill level required.  (Id.)  Because of Compton's skill level, Sterilite decided to rehire Compton as an Assistant Supervisor,[13] but required stringent drug testing over the first six-month to one year period.  (Id.)  There is no evidence in the record when Compton was rehired, other than that it occurred after Wade was terminated.  (Id. at 54.)

Wade and Compton are not suitable comparators for one  simple reason -- Wade never reapplied for a job at Sterilite.  There is no evidence that Evans or any other employee sought Compton out for a position and "gave him another chance." Instead, the evidence shows that Compton was persistent in his quest to get another job with Sterilite, and because of his unique set of skills, his persistence paid off.[14] The fact that Compton reapplied for a position with Sterilite makes him not similarly situated to Wade.  See Smith, 644 F.3d at 1326; Holifield, 115 F.3d at 1562.

---

[13] Assistant Supervisors do a lot of processing on the machines, which requires "a good five to seven years to acquire and master."  (Evans Dep. at 56.)  Evans testified that there are not a lot of people in the Birmingham area with plastics experience who can work at this high skill level.  (Id.)  Wade was not qualified to work in this position.  (Id.)

[14] The differences in Wade's and Compton's positions also contributes to the fact that Compton is not a suitable comparator.

17

### 2. Gary Price

Additionally, Plaintiff points to Gary Price as a suitable comparator.  Gary Price, a maintenance mechanic, was also terminated by Sterilite for failing a drug screen.  (Hollis Dep. at 41.)  The evidence regarding Price's termination and rehire are much less specific than that of the evidence surrounding Compton. The extent of the evidence about Price comes from three pages of the deposition testimony of Hollis, the HR Manager.  (Id. at 41-44.)  Hollis testified that Price was rehired some time after being terminated for testing positive on a drug screen.  (Id. at 42-43.)  Evans was the Plant Manager at the time of Price's termination and rehire.  (Id. at 42.)  Hollis did not know whether Price reapplied for a job with Sterilite or if he was sought out by Sterilite for rehire.  (Id. at 44.)  Hollis also did not know when Price worked for Sterilite, other than her recollection that his termination and rehire occurred before Wade worked for Sterilite.[15]  (Id. at 43.)

From the little bit of information before the court related to Price, the court cannot conclude that he is a suitable comparator.  First, Price and Wade did not hold the same positions, or even close to, the same positions.  Price was in maintenance while Wade worked in production.  Although the Plant Manager, Evans, was the

---

[15]  Price does not currently work for Sterilite, and Hollis did not think that Price worked for Sterilite while Wade was employed there.  (Hollis Dep. at 43-44.)

same, they did not work at Sterilite at the same time.  Additionally, the record does not give any information about how Price was rehired.  Hollis's deposition testimony is slim and does not provide any details.  There are no documents in the record relating to Price and his rehire.  Simply put, the court does not have enough information before it to establish that Price was similarly situated to Wade, as required by the case law.  Because it is Wade's burden to establish each element of the prima facie case, this shortage of evidence contributes to Wade's failure to establish a prima facie case of race discrimination.

Having failed to produce sufficient evidence to establish that the non-minority employees with whom he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was terminated, Wade's prima facie case of disparate treatment fails.  However, the court recognizes that even where a plaintiff fails to show the existence of a similarly situated employee, summary judgment is only appropriate where no other evidence of discrimination is present.  See Wilson v. B/E/ Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004).  Therefore, the court must engage in the pretext analysis for purposes of thoroughness.

## B.  Legitimate, Nondiscriminatory Reason and Pretext

Even if Wade had successfully established a prima facie case of disparate

treatment race discrimination (and to be clear, he has not), his claim would nevertheless fail because Defendant has successfully rebutted any inference of discrimination, and Wade cannot show that the articulated reason for the demotion was a pretext for discrimination.  See Holifield, 115 F.3d at 1564-65.  Sterilite terminated Wade because he failed the drug test. This is a legitimate, nondiscriminatory reason for Wade's termination.  Defendant has met its burden of articulation, the presumption of discrimination is destroyed, (assuming one had been created in the first place), and the burden shifts back to Wade to show by a preponderance of the evidence that race discrimination motivated the decision to terminate him . See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000).

Pretext is established when a plaintiff "present[s] concrete evidence in the form of specific facts" showing that the defendant's proffered reason was pretextual. Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009).  "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."   Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation marks omitted); see also Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir.2005) (A plaintiff's

evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."). A plaintiff does not demonstrate pretext by showing that the defendant had a mistaken belief about the facts that formed the basis for the alleged nondiscriminatory reason. Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1265 (11th Cir. 2002). Instead, the plaintiff must present evidence that the defendant did not honestly believe the facts on which it based its nondiscriminatory reason. Id. Further, when the employer provides a reason "that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." Chapman, 229 F.3d at 1030. Conclusory allegations and assertions of discrimination are insufficient. See Bryant, 575 F.3d at 1308.

Wade attempts to establish that this reason is a pretext for race discrimination in two ways. First, he argues that the court should use the same evidence of similarly situated employees to establish pretext. Next, he contends that there is evidence that the reason is unworthy of credence. Both arguments fail.

Wade's first pretext argument falls short for the same reasons discussed above with regard to his prima facie case. While it is true that evidence of similarly situated white employees were treated more favorably could be evidence of pretext, there is

no such evidence here.  Given that the court has already concluded that Compton and Price are not "similarly situated," Wade's attempt to establish pretext on a comparison of the disciplinary treatment is insufficient to raise a genuine issue of material fact. See Floyd v. Federal Exp. Corp., 423 Fed. Appx. 924, 931 (11th Cir. 2011).

Additionally, Wade's "evidence" that the stated reason for his termination is unworthy of credence does not hold water.  Wade points to two pieces of "evidence" to cast doubt on Sterilite's legitimate, nondiscriminatory reason for his termination: (1) Wade denies that he was taking any illegal narcotic other than those for which he had a prescription; and (2) Wade contends that the policy was discretionary, that he could have been allowed to be retested, and could have retained his job if Evans had wanted him to stay.  Both arguments fail.

Wade contends that he did not take Hydromorphone and that he took a second test (five days after the first test) and provided those test results "showing" that the first test was inaccurate.   These self-serving assertions, however, do not aid in his burden of establishing that Defendant believed that his first test showed that he had taken drugs for which he did not have a prescription.  To show that the proffered reason for his termination was pretextual, Plaintiff must show that Defendant based the decision to terminate Plaintiff on an unreasonable belief that he behaved in the manner alleged.  See, e.g., Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1261

22

(11th Cir. 2001), <u>cert. denied</u>, 534 U.S. 976 (2001) (pretext means more than a mistake by the employer; actions taken based on a mistaken, non-discriminatory belief do not violate Title VII); <u>Lee v. GTE Fla., Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000), <u>cert. denied</u>, 532 U.S. 958 (2001) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by sex."); <u>Equal Employment Opportunity Comm'n v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171 (11th Cir. 2000) (plaintiff could be properly discharged on defendant's good faith belief that she lied in an internal investigation); <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1339 (11th Cir. 2000), <u>reh'g denied</u>, 218 F.3d 749 (11th Cir. 2000) ("a plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir.1991) (court's pretext inquiry is properly limited to whether the decision-makers believed the employee had engaged in conduct for which he was terminated and if so whether this belief was the reason for the discharge, not whether plaintiff was actually guilty of the conduct); <u>Conner v. Fort Gordon Bus Co.</u>, 761 F.2d 1495, 1501 (11th Cir.1985) (employer's belief, honest but mistaken, may nonetheless provide legitimate reason for discharge).

Despite Plaintiff's conclusory assertion to the contrary, he has offered no evidence which contradicts the evidence before this court that Sterilite terminated him because

it believed that he took an illegal drug and had it in his system while at work.  <u>See</u> <u>Thomas v. Miami Veterans Med. Cntr.</u>, 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (conclusory allegations insufficient to support pretext); <u>Mayfield v. Patterson</u> <u>Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations, without more, are insufficient to show pretext).

Moreover, there is no evidence that Evans or Sterilite viewed the drug policy as discretionary.  Instead, the evidence before the court is that every employee who failed the drug test was terminated.  That some individuals were hired back for various reasons does not somehow make Wade's termination a farce for discrimination.  It is well-established that the federal courts should not serve as "super-personnel department[s] that reexamine[ ] an entity's business decisions." <u>Chapman</u>, 229 F.3d at 1030 (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir.1991)).

In short,  to prevail on Defendant's summary judgement motion, Plaintiff must come forward with evidence sufficient for a reasonable jury to conclude that the challenged conduct or decisions were indeed motivated by intentional discrimination or that defendant's proffered legitimate reasons were merely a pretext for illegal discrimination.  Plaintiff has not carried his burden of production.  At best, he is only quarreling with Defendant's articulated reasons, which is not sufficient.  <u>See</u>

24

Chapman, 229 F.3d at 1030.

**V.  Conclusion**

In summary, the court finds that no material issues of fact remain and that Defendant Sterilite Corporation is entitled to judgment as a matter of law as to all claims asserted by Plaintiff.

A separate order will be entered.

**DONE** this the  13th  day of September, 2011.

_James W. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE